1

2

3

4

5

6

7

8

9

10

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

11  MARTIN ANTHONY FARIAS,                )        1:07-CV-00837 LJO JMD HC
                                          )
12                    Petitioner,         )
                                          )        FINDINGS AND RECOMMENDATION
13         v.                             )        REGARDING PETITION FOR WRIT OF
                                          )        HABEAS CORPUS
14  THOMAS FELKER,                        )
                                          )
15                    Respondent.         )
    _____)

16

17        Petitioner Martin Anthony Farias ("Petitioner") is a state prisoner proceeding pro se with a

18  petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

19                          **PROCEDURAL BACKGROUND**

20        Petitioner is currently in the custody of the California Department of Corrections and

21  Rehabilitation pursuant to a judgment of the Tulare County Superior Court.  (Pet. at 2).  On January

22  11, 2005, Petitioner was convicted by a jury of second degree murder (Cal. Penal Code § 187(a))

23  with a firearm enhancement (Cal. Penal Code § 12022.53(d)).  (Id.).  Petitioner was sentenced to an

24  aggregate term of forty years-to-life.  (Answer at 2).

25        Petitioner appealed his conviction to the California Court of Appeal, Fifth Appellate District

26  on January 19, 2005.  (Id.)  The appellate court affirmed Petitioner's conviction on February 27,

27  2006.

28        Petitioner subsequently submitted a petition for review to the California Supreme Court.

U.S. District Court
E. D. California                                    1

1    (Lod. Doc. 3).  The California Supreme Court summarily denied review on May 10, 2006.

2          Petitioner filed this instant federal petition for habeas corpus relief on March 30, 2007.  The

3    petition alleges as the sole ground for relief that the trial court erred in failing to instruct the jury *sua*

4    *sponte* that Petitioner's misleading statement was not itself sufficient to prove Petitioner's guilt.

5    (Pet. at 12).

6          On October 30, 2007, Respondent filed an answer to the petition.

7                        **FACTUAL BACKGROUND**[1]

8          Dina Guzman was shot and killed in the bedroom she shared with [Petitioner]
     Martin Anthony Farias in his parents' house.  [Petitioner] was charged with Guzman's
9    murder (Pen.Code,FN1 § 187).  At trial, [Petitioner] claimed the gun fired
     accidentally as he was trying to wrest it from Guzman's grasp.  The jury rejected the
10   defense theory of an accidental shooting and found [Petitioner] guilty of second
     degree murder.  The jury also found [Petitioner] personally discharged a firearm
11   within the meaning of section 12022.53, subdivision (d).  The court sentenced
     defendant to a total prison term of 40 years to life...
12         On the evening of May 20, 2003, Guzman, who was a student at a
     cosmetology school, had plans to practice on her friend Maria Villafana's fingernails.
13   Villafana came over to [Petitioner]'s house to pick Guzman up and drive her to
     Villafana's house which was about a block away.  After Guzman arrived at Villafana's
14   house, she realized she had forgotten to bring her acrylic powder.  Guzman seemed
     upset and said she and [Petitioner] had gotten into an argument.  Guzman started
15   trying to call her father and sister to have them go to [Petitioner]'s house to pick up
     her "stuff." Guzman told Villafana's sister, Karina Villafana, she wanted to get her
16   stuff because she and [Petitioner] were arguing and she did not want to be with him
     anymore.[2]
17         Shortly after Guzman arrived at Villafana's house, [Petitioner]'s young niece
     and nephew, Alma and Salvador, who also lived at [Petitioner]'s house, came over to
18   speak with Guzman.  After the children left, Guzman said she was going back to
     [Petitioner]'s house to get her stuff because [Petitioner] had left.  Villafana offered to
19   give Guzman a ride.  When they arrived at [Petitioner]'s house, [Petitioner] and his
     mother were out on the front porch.  [Petitioner] was wearing a black and white
20   checkered shirt.
21         Villafana waited in front of [Petitioner]'s house in her car.  She watched
     Guzman go directly inside the house through the front door.  [Petitioner] and his
     mother followed her.  Villafana could see into the house through the big window in
22   the living room.  She saw Guzman go straight to her bedroom.  [Petitioner] followed
     her. The children were watching television in the living room. [Petitioner]'s mother
23   came back outside and invited Villafana inside, explaining it was "going to be a
     while."  Villafana chose to remain in her car and played a game on her cell phone.

24

25       [1]The facts are derived from the factual summary set forth by the Fifth District Court of Appeal in its unpublished
     opinion issued on February 27, 2006, and are presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1).
26

27       [2]The Villafana sisters also testified regarding injuries they had seen on Guzman on two past occasions. According
     to Villafana, on one occasion Guzman had a bump on her head but "stayed silent" when asked about it. The same day,
28   Guzman asked Villafana to help her move out of defendant's house. According to Karina, when questioned on another
     occasion about a bruise on her shoulder, Guzman eventually said defendant "did it." But Karina acknowledged Guzman said
     this in a "humorous joking manner" and that she did not believe Guzman at the time.

Salvador heard a noise like a firecracker coming from [Petitioner]'s bedroom. He and Alma went into the bedroom and saw Guzman lying on the floor bleeding. When Alma came close to help Guzman, Guzman told the children to move away a little bit because she could not breathe.

Villafana testified that a few minutes after Guzman went into the house, she saw [Petitioner] struggling with his father in the hallway. Alma and Salvador ran out of the house and starting hitting Villafana's window, screaming at her to call the police and an ambulance. Villafana called 911 on her cell phone. Then Villafana saw [Petitioner] walk to her car but she was not certain what direction he came from. [Petitioner] told Villafana that Guzman had been shot, and asked her, "Did you see anybody at the window? Did you see any car drive by?" When Villafana said no, [Petitioner] left and walked away down the street. Villafana noticed he was not wearing a shirt.

A police officer was dispatched to [Petitioner]'s house in response to the 911 call. As he was getting out of his car, a young girl ran up to him "very excited and yelled, 'She's been shot.' " The girl told the officer it was a drive-by shooting. When the officer went inside the house, he saw [Petitioner]'s father holding Guzman, who was then lying in the hallway. The officer checked Guzman's pulse but found none. A short time later, emergency personnel transported Guzman to the hospital.

On May 25, 2003, five days after the shooting, [Petitioner] called Marcelino Morales, a private investigator, and asked Morales to help him turn himself in to the police. [Petitioner] met Morales in Hanford. [Petitioner] seemed sad and scared. Morales drove [Petitioner] to the Visalia Police Department. [Petitioner] was arrested around midnight.

According to the pathologist who performed Guzman's autopsy, she bled to death from her gunshot wounds. Guzman had two wounds as a result of a single gunshot: an entry wound in her upper chest and an exit wound in her lower back. According to the pathologist, the bullet "traveled in basically a general front-to-back direction with moderate downward deviation, and right to left."

A crime scene investigator measured [Petitioner]'s bedroom and determined it was approximately nine and a half feet by nine and a half feet. There was blood on the carpet and blood spatter on the east wall and on the television in front of the wall. The lowest portion of blood spatter on the wall was one foot, three and a half inches from the floor. The highest portion was four feet, seven and a half inches from the floor. A hole was found in the east wall but the cause of the hole was not determined.

One of the detectives found a .38-caliber Smith & Wesson Special revolver in a woodpile in the backyard. The gun contained five live rounds and one spent casing, indicating one bullet had been fired. Despite performing a thorough search, investigators were unable to find the bullet. A single latent fingerprint obtained from black electrical tape wrapped around the handle of the gun did not match either defendant or Guzman.

Guzman's hands were processed for gunshot residue. According to criminalist Steven Dowell, particles collected from her hands and hairline were consistent with gunshot residue. Dowell opined Guzman could have gotten the residue on her body one of three ways: by discharging a firearm, by being in close proximity to a firearm when it was discharged, or by having a hobby or occupation that put her in contact with particles consistent with gunshot residue.

Steven O'Clair, a firearms examiner and blood spatter expert, reviewed the physical evidence and concluded Guzman was shot at close range from inside the bedroom, with the gun being fired at least two feet from the front of her shirt. Based on the location of the blood evidence, O'Clair opined that, when she was shot, Guzman was standing two to three feet from the east wall, and that afterward she collapsed next to the bed. O'Clair also tested the gun and determined it could fire both single action (firing after pulling back the hammer and then pulling the trigger) and double action (firing by just pulling the trigger). He determined that if used as a single action it would require two and a half to three pounds of pressure to discharge

the firearm.  If used as a double action, eight to nine pounds of pressure would be needed to discharge the gun.

**The Defense**

Peter Barnett, a defense criminalist and blood spatter expert, disagreed with O'Clair's opinion that Guzman was shot as she stood with her back to the east wall of defendant's bedroom.  Rather, the evidence suggested to him that Guzman was in a position lower than the shooter, such as kneeling or bending over.  Barnett opined the blood spatter on the wall was not caused by the impact of the bullet or the exiting of the bullet but rather came from by some "post shooting movement" by Guzman or some object that had come in contact with her, including people who were trying to render her aid.  Barnett concluded that when Guzman was shot, she was likely sitting on the bed or backed up against the bed, in a "low down position and probably bent forward a little bit...."

[Petitioner] testified on his own behalf. He admitted he had previously been convicted of a felony in January 2000.  According to [Petitioner]'s testimony, he met Guzman in August 2002 at a cousin's birthday party.  They began dating shortly thereafter.  In October 2002, Guzman came to live with [Petitioner] at his parents' house.

Guzman usually held down more than one job at a time because she liked to work and stay busy.  Eventually, she enrolled in a school to study cosmetology. [Petitioner] helped her pay for school by working for his brother in a roofing company.

[Petitioner] bought a lot of presents for Guzman, including belts and rings. [Petitioner] bought Guzman a "promise ring" which she would refer to as her "engagement ring."  Although they had discussed getting married, [Petitioner] and Guzman had never made specific plans, such as setting a wedding date.

While they were living together, Guzman left [Petitioner] three times after they had had disagreements.  Various friends and family members would come over and help her move all her belongings out of [Petitioner]'s room.  [Petitioner] explained that when Guzman was upset or angry, her typical response was "just try to avoid the situation and just like walk away...."

[Petitioner] testified that two days before Guzman was killed, there had been a drive-by shooting at his house around two or three o'clock in the morning.  The bullet struck near where Salvador and Alma slept in the living room.[3]  Two police officers came to the house and took a report.  They also searched the premises but did not find anything.  The next day, [Petitioner] found a shell casing outside the house.

The day after the drive-by shooting, [Petitioner] purchased a gun from his friend for about $100.  [Petitioner] knew it was illegal for him to own or possess a firearm because of his prior conviction.  He did not tell Guzman he bought the gun because she would not have allowed him to have it.  [Petitioner] put the gun between the two mattresses on his bed.  [Petitioner] ordinarily kept his bedroom door locked for privacy because children were often in and out of the house.  Both he and Guzman had a key to the room.

On May 20, 2003, Guzman called [Petitioner] and asked him if he would pick her up from work.  When [Petitioner] told her he did not have access to a car, she responded, "Well fine. Whatever."  She then hung up the phone.  When Guzman got back to the house, she was already upset with [Petitioner] because he did not pick her up and because he had forgotten his sister's birthday the day before.  Guzman went to their bedroom while [Petitioner] went out to the backyard.

A short time later, [Petitioner] went into the bedroom.  Guzman was sitting on the bed with items, including scissors and a pen.  She was putting together a birthday gift for [Petitioner]'s sister. While Guzman and [Petitioner] were "still arguing,"

---

[3]During the prosecution's case, Alma testified she did not hear anything on the night of the drive-by shooting but was awakened by the noise of [Petitioner] and her grandparents talking. After that, police arrived and took pictures.

1   Guzman said she had to go do Villafana's nails and left the bedroom to call Villafana

2   from the kitchen.  When she tried to get back into the bedroom, she found it was
    locked and asked [Petitioner] to open the door.  [Petitioner] refused, saying, "No. You
    got your own key."  Guzman told [Petitioner] to open the door and "quit acting like a
3   jerk."  [Petitioner] again refused to open the door.  Guzman then said she would get
    her stuff later and left with Villafana.  Guzman seemed to want to get back into the
4   room to get additional cosmetic supplies and [Petitioner] remembered her mentioning
    powder she needed.
5           After Guzman left, [Petitioner] sat on the porch and ate some food his mother
    prepared.  During this time, [Petitioner] "cooled off" from his argument with
6   Guzman.  [Petitioner] realized his actions had been "stupid" and "immature."  Alma
    and Salvador were playing in the front yard.  [Petitioner] asked Salvador to go tell
7   Guzman to call him or come back and get whatever she needed.
            Guzman returned to the house and [Petitioner] let her into their bedroom.
8   [Petitioner] went to the kitchen to put his bowl down and have a glass of water.  A
    few minutes later, he went into the bedroom.  He found Guzman standing next to the
9   bed.  She was holding the gun by the barrel and looking at it.  [Petitioner] closed the
    door.  Guzman asked, "What the hell do you want this for. I told you about this. I
10  thought we talked about this.... I told you, not again."  [Petitioner] explained they
    needed the gun for protection.  They started arguing and Guzman said she was going
11  to get rid of the gun.  As they argued, Guzman was waving the gun around.
    [Petitioner] grabbed the gun and they started to have a "little tug of war" with it.
12  Guzman was holding the barrel of the gun with both hands.  As she lost hold of the
    gun and slipped backwards onto the bed, the gun went off.
13          Guzman started to slump down and [Petitioner] saw blood on her shirt.  He
    hugged her because she was falling down onto the bed.  [Petitioner] then put her
14  down on the floor and tried to give her mouth-to-mouth resuscitation.  [Petitioner]'s
    parents came into the bedroom and started asking what had happened.  Everyone
15  started yelling and [Petitioner] told them to call for an ambulance.  [Petitioner] got up
    and went to the telephone and tried to dial 911 but could not do it because he was in
16  shock.  When [Petitioner] tried to go back into the bedroom, his father grabbed him
    and stopped him.  [Petitioner]'s father said, "We're gonna handle this."  He then
17  pushed [Petitioner] and told him to "[g]et out of here."
            [Petitioner] walked out the front of the house and told Villafana that Guzman
18  had been shot and to call 911.  [Petitioner] then walked away and went to a friend's
    house.  [Petitioner] explained he walked away because he was scared, in shock, and
19  "couldn't believe what just happened."  [Petitioner] had his friend call to find out if
    Guzman was all right.  After his friend made the call, he came back and told
20  [Petitioner] Guzman had died.
            Before turning himself in, [Petitioner] stayed at different friends' houses.  This
21  time was a "nightmare" for him.  [Petitioner] was very depressed.  He wanted to turn
    himself in but felt he needed somebody to help him because he was scared and in a
22  state of shock.  [Petitioner] remembered his sister had a friend who was a private
    investigator and got the telephone number.  After [Petitioner] contacted the
23  investigator, they met and the investigator drove [Petitioner] to the police station,
    where [Petitioner] was handcuffed and taken to an interview room.  A detective
24  advised [Petitioner] of his rights and asked him if he knew why he was there.  As
    soon as the detective said Guzman's name, [Petitioner] broke down crying and the
25  interview was terminated shortly thereafter because [Petitioner] was crying
    uncontrollably.
26          [Petitioner] denied telling Villafana there had been a drive-by shooting or
    asking her if she had seen anybody.  [Petitioner] also claimed he did not know who
27  hid the gun in the woodpile.  [Petitioner] denied hitting Guzman during the eight
    months they were together.
28
    (Pet. App. A at 2-9)

1

**DISCUSSION**

2 **I.      Jurisdiction**

3          A person in custody pursuant to the judgment of a state court may petition a district court for

4 relief by way of a writ of habeas corpus if the custody is in violation of the Constitution, laws, or

5 treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); <u>Williams v. Taylor</u>, 529

6 U.S. 362, 375 n.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by

7 the U.S. Constitution.  Furthermore, Petitioner's custody arose from a conviction in the Tulare

8 County Superior Court and an application for writ of habeas corpus may be filed "in the district court

9 for the district within which the State court was held which convicted and sentenced [petitioner]."

10 28 U.S.C. § 2241(d).  As the Eastern District of California encompasses Tulare County, this court

11 has jurisdiction over the instant action.  *See* 28 U.S.C. § 84(b).

12          On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

13 1996 ("AEDPA"), which applies to all petitions for a writ of habeas corpus filed after the statute's

14 enactment.  <u>Lindh v. Murphy</u>, 521 U.S. 320, 326-327 (1997); <u>Jeffries v. Wood</u>, 114 F.3d 1484, 1499

15 (9th Cir. 1997), *cert. denied*, 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting <u>Drinkard v. Johnson</u>, 97

16 F.3d 751, 769 (5th Cir. 1996), *cert. denied*, 520 U.S. 1107 (1997), *overruled on other grounds by*

17 <u>Lindh</u>, 521 U.S. 320 (holding AEDPA only applicable to cases filed after statute's enactment)).  The

18 instant petition was filed on August 10, 2005 and is consequently governed by the provisions of the

19 AEDPA, which became effective April 24, 1996.  <u>Lockyer v. Andrade</u>, 538 U.S. 63, 70 (2003).

20 **II.      Legal Standard of Review**

21          This Court may entertain a petition for a writ of habeas corpus by "a person in custody

22 pursuant to the judgment of a state court only on the ground that he is in custody in violation of the

23 Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

24          Since Petitioner filed his petition after the effective date of AEDPA, his petition for habeas

25 corpus "may be granted only if he demonstrates that the state court decision denying relief was

26 "contrary to, or involved an unreasonable application of, clearly established Federal law, as

27 determined by the Supreme Court of the United States.""  <u>Irons v. Carey</u>, 505 F.3d 846, 850 (9th Cir.

28 2007) (quoting 28 U.S.C. § 2254(d)(1)); *see* <u>Lockyer</u>, 538 U.S. at 70-71.

1      As a threshold matter, this Court must "first decide what constitutes 'clearly established

2  Federal law, as determined by the Supreme Court of the United States.'" <u>Lockyer</u>, 538 U.S. at 71

3  (quoting 28 U.S.C. § 2254(d)(1)).  In ascertaining what is "clearly established Federal law," this

4  Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of

5  the time of the relevant state-court decision." <u>Id</u>. (quoting <u>Williams</u>, 592 U.S. at 412). "In other

6  words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or

7  principles set forth by the Supreme Court at the time the state court renders its decision." <u>Id</u>.

8      Finally, this Court must consider whether the state court's decision was "contrary to, or

9  involved an unreasonable application of, clearly established Federal law." <u>Lockyer</u>, 538 U.S. at 72,

10  (quoting 28 U.S.C. § 2254(d)(1)).  "Under the 'contrary to' clause, a federal habeas court may grant

11  the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

12  question of law or if the state court decides a case differently than [the] Court has on a set of

13  materially indistinguishable facts." <u>Williams</u>, 529 U.S. at 413; *see also* <u>Lockyer</u>, 538 U.S. at 72.

14  "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court

15  identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies

16  that principle to the facts of the prisoner's case." <u>Williams</u>, 529 U.S. at 413.  "[A] federal court may

17  not issue the writ simply because the court concludes in its independent judgment that the relevant

18  state court decision applied clearly established federal law erroneously or incorrectly. Rather, that

19  application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable

20  application" inquiry should ask whether the state court's application of clearly established federal law

21  was "objectively unreasonable." <u>Id</u>. at 409.

22      Petitioner bears the burden of establishing that the state court's decision is contrary to or

23  involved an unreasonable application of United States Supreme Court precedent. <u>Baylor v. Estelle</u>,

24  94 F.3d 1321, 1325 (9th Cir.1996). Although only Supreme Court law is binding on the states, Ninth

25  Circuit precedent remains relevant persuasive authority in determining whether a state court decision

26  is objectively unreasonable.  *See* <u>Clark v. Murphy</u>, 331 F.3d 1062, 1069 (9th Cir. 2003); <u>Duhaime v.</u>

27  <u>Ducharme</u>, 200 F.3d 597, 600-01 (9th Cir. 1999).

28      AEDPA requires that we give considerable deference to state court decisions. The state

1  court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). We are bound by a state's

2  interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir. 2002), *cert. denied*,

3  537 U.S. 859, 123 S.Ct. 231 (2002), *rehearing denied*, 537 U.S. 1149, 123 S.Ct. 955 (2003).

4  **III.      Review of Petitioner's Claim**

5          The sole ground for relief contained in the petition alleges that the trial court erred in not *sua*

6  *sponte* instructing the jury that a defendant's misleading statement is not sufficient by itself to prove

7  guilt.[4]  (Pet. at 12-13).  Petitioner raised this argument to the California Court of Appeal, the last

8  court to issue a reasoned opinion in this case. (*See* Pet. App. A).  The California Supreme Court

9  summarily denied this claim when Petitioner sought review before the state's highest court.  The

10  California Supreme Court, by its "silent order" denying review of the California Court of Appeal's

11  decision, is presumed to have denied the claims presented for the same reasons stated in the state

12  appellate court's opinion. Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).

13          Petitioner does not expressly  assert a federal constitutional violation resulted from the trial

14  court's failure to issue CALJIC No. 2.03, merely that the trial court had a duty to do so under

15  California appellate court precedents.  In conducting habeas review, a federal court is limited to

16  deciding whether a conviction violated the Constitution, laws, or treaties of the Untied States."

17  Estelle v. McGuire, 502 U.S. 62, 67-68 (1991)(citing 28 U.S.C. § 2241 and Rose v. Hodges, 423

18  U.S. 19, 21 (1975)(per curiam)); *see also* Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985),

19  *cert. denied*, 478 U.S. 1021 (1985).  Thus, the Court cannot examine whether the trial court erred in

20  not issue CALJIC No. 2.03  under applicable state law.  However, the Due Process Clause of the

21  Fourteenth Amendment requires that the state prove all elements of the offense charged and all facts

22  necessary to establish each of those elements beyond a reasonable doubt.  *See* Sullivan v. Louisiana,

23  508 U.S. 275, 277-78, 113 S.Ct. 2078 (1993); In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068

24  (1970).  A defendant's right to due process is denied where a jury is not properly instructed that the

25  defendant's guilt must be proven beyond a reasonable doubt. Sullivan, 508 U.S. at 278.  However,

26  _____

27  [4]California Jury Instruction Code ("CALJIC") No. 2.03, the specific instruction at issue in this habeas petition, states
that, "If you find before this trial the defendant made a willfully false or deliberately misleading statement concerning the
crime for which he is now being tried, you may consider that statement as a circumstance tending to prove a consciousness
28  of guilt.  However, that conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are for you
to decide."

1    not all errors in a jury instruction rises to the level of a due process violation.  Middleton v. McNeil,

2    541 U.S. 433, 437, 124 S.Ct. 1830 (2004).  Thus, to obtain federal habeas relief on the basis of an

3    incorrect jury instruction, a petitioner must show more than that the instruction was undesirable,

4    erroneous, or even universally condemned; the question is whether the instruction by itself so

5    infected the entire trial that the resulting conviction violated due process.  Estelle, 502 U.S. at 71-72.

6    "It is well established that the instruction 'may not be judged in artificial isolation,' but must be

7    considered in the context of the instructions as a whole and the trial record."  Id.  "If the charge as a

8    whole is ambiguous, the question is whether there is a reasonable likelihood that the jury has applied

9    the challenged instruction in a way that violates the Constitution."  Middleton v. McNeil, 541 U.S.

10   433, 437 (2004) (quotation marks omitted).

11          As noted by the appellate court,  the failure to instruct the juror pursuant to CALJIC No. 2.03

12   was harmless in Petitioner's case.  The California Court of Appeal implicitly declined to reach the

13   merits of whether the trial court had a duty to *sua sponte* instruct the jury with CALJIC No. 2.03

14   where there existed an evidentiary basis for issuing the instruction.[5]   Rather, the court stated that:

15          [O]ur review of the record in this case convinces us that appellant was not
       prejudiced by the court's failure to instruct the jury with CALJIC No. 2.03.  Contrary
16     to defendant's suggestion, the prosecutor did not rely on his misleading statements to
       Villafana to refute defendant's claim the shooting was accidental or to prove he acted
17     with malice.  Rather, the record reflects the prosecutor only mentioned defendant's
       misleading statements a few times in closing argument and omitted any mention of
18     them in her rebuttal argument.  The prosecutor focused on the implausibility of
       defendant's claim the gun fired accidentally during a "tug of war" between him and
19     Guzman.  The prosecutor reviewed the physical evidence and the testimony of the
       prosecution's experts and explained how they contradicted defendant's version of
20     events.  The record reflects the prosecutor never singled out defendant's misleading
       statements as evidence of a guilty conscience but rather discussed them in conjunction
21     with his flight after the shooting.  Indeed, the prosecutor placed greater emphasis on
       the undisputed fact that defendant fled and hid for five days before turning himself in
22     than on his disputed statements to Villafana following the shooting.  The record does
       not support defendant's assertions that the prosecutor's argument probably misled the
23     jury into believing it could convict defendant of the crime based on his misleading
       statements alone.
24          Furthermore, the jury was properly instructed on the elements of murder and
       the lesser included crimes and that each had to be proved beyond a reasonable doubt.
25     We presume the jury followed the instructions as given ( People v. Osband (1996) 13

26   _____

27   [5]Indeed, such a duty has been called into question by the California Supreme Court in People v. Carter, 30 Cal.4th
     1166, 1197-1198 (Cal. 2003) which stated that People v. Atwood, 223 Cal.App.2d 316, 332-333 (Cal. Ct. App. 1963)(holding
28   that trial court had duty to *sua sponte* issue CALJIC No. 2.03) lacked continuing validity in the view of their decision in
     People v. Collie, 30 Cal.3d 43, 63 (Cal. 1981). In Collie, the California Supreme Court held that the trial court only had duty
     to *sua sponte* instruct on defenses and lesser included offense.

1    Cal.4th 622, 714), and the jury understood it was to consider the instructions as a
     whole and each in the context of all the others ( People v. Mills (1991) 1 Cal.App.4th
2    898, 918). Defendant does not claim the instructions, considered as a whole, misled
     the jury as to any of the elements of second degree murder. Moreover, the jury
3    received CALJIC No. 2.52, which instructed that the "flight of a person immediately
     after the commission of a crime, or after he is accused of a crime, is not sufficient in
4    itself to establish his guilt, but is a fact which, if proved, may be considered by you ...
     in deciding" whether defendant was guilty or not guilty. In light of the emphasis the
5    prosecutor placed on defendant's flight, and the jury's receipt of a specific instruction
     that such evidence, though probative, was insufficient by itself to prove guilt, it is
6    unlikely that the jurors in this case would have understood that defendant's misleading
     statements to Villafana were sufficient by themselves to prove his guilt. For all these
7    reasons, we conclude that the court's failure to instruct the jury with CALJIC No.
     2.03, if error, was not prejudicial to defendant.
8    (Pet. App. A at 11-12)

9           The record supports the appellate court's conclusion that the failure to issue CALJIC No.

10   2.03 was not prejudicial.  The misleading statement at issue is Petitioner's statement to Maria

11   Villafina immediately after the shooting of the victim in which he inquired if she had seen a car drive

12   by.   Our review of the record reveals only four instances in which the jury heard of Petitioner's

13   misleading statement.  The first two instances were during the testimony of Ms. Villafina when she

14   testified to the content of statements.  (RT at 102, 145).  The other two instances occurred when the

15   prosecutor briefly mentioned the statements in her closing arguments.  As noted by the appellate

16   court, the prosecutor did not single out the misleading statements as evidence of Petitioner's guilty

17   consciousness.  Rather, the prosecutor mentioned the statement in summarizing the testimony of Ms.

18   Villafina, stating that, "Maria also told you that the defendant came running out and she specifically

19   said she didn't recall him coming through the front door.  She couldn't say where he came from.  He

20   came out and said Dina had been shot.  'Did you see someone.  Did you see someone come by.  Did

21   you see someone.  Was it a drive-by.' "  (RT at 951).  The only time the Prosecutor's statement

22   implied that Petitioner's misleading statement was evidence of his guilt was in discussing

23   Petitioner's flight from the scene of the crime, stating, "[w]e know the defendant didn't come out the

24   front door.  He hid the gun in the woodpile.  He makes up the story of a drive-by and he takes off and

25   he's gone for five days."  (RT at 966).

26          Furthermore, the Court's review of the instructions as a whole leads to the conclusion that the

27   trial court's failure to issue CALJIC No. 2.03 did not render the trial fundamentally unfair in

28   violation of due process and therefore the petition for habeas corpus relief must be rejected.  *See*

1    Johnson v. Sublett, 63 F.3d 926, 930 (9th Cir. 1995).  Here, the trial court instructed the jury on the

2    elements of the crime and that the state bore the burden of proving Petitioner guilty beyond a

3    reasonable doubt.  (RT at 918-920, 928).  Additionally, in instructing the jury on the lesser offenses

4    of murder in the second degree and manslaughter, the trial court admonished the jury that they were

5    required to be convinced beyond a reasonable doubt.  (RT at 939).  The record further reveals that

6    the trial court noted with regard to the admission of propensity evidence that, "this inference is

7    simply one item for you to consider along with all other evidence in determining whether the

8    defendant has been proved guilty beyond a reasonable doubt of the charge crime." (RT at 924).  The

9    trial court again emphasized this requisite burden of proof in instructing the juror that, "the defendant

10   may choose to rely on the state of the evidence and upon the failure, if any, of the People to prove

11   beyond a reasonable doubt every essential element of the charge against him." (RT at 925).  The trial

12   court then conveyed the presumption that Petitioner was innocent and that this placed the burden on

13   the People to prove Petitioner guilty beyond a reasonable doubt.  (RT at 928).  The definition of

14   reasonable doubt was then read to the jury.  (Id). These instructions made it abundantly clear to the

15   jury that in order to convict Petitioner they were required to find all the essential elements of the

16   crime beyond a reasonable doubt.  Thus, a consideration of the instructions as a whole leads the

17   Court to the conclusion that the trial court's failure to instruct the jury that the Petitioner's

18   misleading statement were not sufficient by itself to convict Petitioner was violative of his right to

19   due process of the law.

20          Thus, the failure to instruct the jury pursuant to CALJIC No. 2.03 did not so infect the trial as

21   to impinge upon Petitioner's right to due process of the law.  The record reveals only brief mentions

22   of Petitioner's misleading statements.  More importantly, the admonitions issued by the trial court

23   correctly instructed the jury on the elements of the charged offenses and that the prosecutor bore the

24   bore of proving those elements beyond a reasonable doubt.  Consequently, the state appellate court's

25   decision, that the trial court's failure to instruct the jury constituted harmless error, is not an

26   unreasonable application of clearly established federal law warranting habeas relief.  *See* 28 U.S.C. §

27   2254(d)(1).

28                                                **RECOMMENDATION**

1      Accordingly, the Court RECOMMENDS that the petition for writ of habeas corpus be

2 DENIED WITH PREJUDICE and the Clerk of Court be DIRECTED to enter judgment for

3 Respondent.

4      This Findings and Recommendation is submitted to the Honorable Lawrence J. O' Neill,

5 United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule

6 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of

7 California.  Within thirty (30) days after being served with a copy, any party may file written

8 objections with the court and serve a copy on all parties.  Such a document should be captioned

9 "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the objections shall

10 be served and filed within ten (10) court days (plus three days if served by mail) after service of the

11 objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. §

12 636(b)(1)(c).  The parties are advised that failure to file objections within the specified time may

13 waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

14

15

16 IT IS SO ORDERED.

17 **Dated:      October 27, 2008                         /s/ John M. Dixon**
                                     UNITED STATES MAGISTRATE JUDGE

18

19

20

21

22

23

24

25

26

27

28